Rosemary Marcus on behalf of Mr. Yuris Bonilla-Guizar, good morning. I would like to, with the Court's permission, address the trial issues and have Mr. León address the sentencing issues and reserve two minutes for rebuttal. Do you want to divide that up? I would do about seven minutes, if that's okay. All right. Sure. Thank you. Your Honors, this case involves the expert witness, the government presented an expert witness to testify about smuggling organizations, structures, and operations. And the government did so, and the district court qualified the case agent as an expert witness on these issues. When this case really did not need an expert witness at all. The charges in this case were conspiracy to hostage taking, hostage taking, and the third one was harboring an illegal alien. None of these cases required any connection, required the government to prove any connection to any alien smuggling organizations. In fact, it was a very simple case where all they had to prove was for the hostage taking, they didn't even have to prove that the person was an alien. All they had to prove was that somebody was being held against their will in an effort to get a third person to commit to do something. Go ahead. Oh, I'm sorry. Counsel, hasn't this Court upheld expert testimony regarding the structure of alien smuggling operations in Mahia Luna? They have, you have, Your Honor. However, those cases were very different. In Mahia Luna, that case involved transportation of aliens, which is in an effort similar to our case. However, in that case, there was a situation where a jury would need assistance in deciphering what was innocuous conduct. Essentially, what that case involved was the defendant was transporting a load of people, a vehicle, with undocumented people. But he was saying, I was never going to get paid, I did not get paid, and really, I was just doing the driving from, you know, South Arizona. But still, why wouldn't the jury benefit from understanding the structure of these operations? After all, smuggling operations are not the grist of day-to-day life for most people, and so why wouldn't it be of some benefit to hear it? Because the case law says you have to have, you know, in order to admit this testimony, you have to have some relevance to certain, to an issue of fact or an issue. In this case, you had to be. This was not relevant to the legal issues in this case? No, it was not. The fact that there was an alien smuggling operation, a smuggling operation in Mexico and different compartments all over the place in the United States and Mexico, and how they divided the work was not relevant to any of the testimony in this case. The government is saying, well, it puts it in perspective and context, but they had video from the swap meet. Can I just stop on that point? Because I just wanted to explore with you the proposition you began with, and I think you said they didn't kind of, quote, need the testimony. But that's really not the standard. In other words, to say they could have proven it otherwise is not the standard as to whether or not, as Judge Martelly referenced, it's relevant by way of context and background. So going back to your first proposition, well, they didn't need it. What's your support for us tipping the verdict on the basis of that standard? Well, because they have to, in order to have this expert, they would have to have the expert needs to be, and by need I mean you need to, in order to present this expert, you need to have a material fact that this expert could assist the jury in determining, explaining it and understanding it. I thought the issue that the expert was going to at least be able to help the jury on was that your clients were defending on the ground that, look, there might well have been some alien smuggling going on here, but there was no hostage taking, and that the jury would need some guidance to figure out, well, here are a set of facts. Perhaps the person wasn't taking hostage. I thought the expert's testimony went to that issue, no? But he didn't. If you look at the expert's testimony, he never discussed how that was, how his testimony was relevant to that defense. So there was nothing connecting the expert's testimony to what the defense was other than prejudicing the case. And on that point, even if we do have some sort of relevance and need for this expert, it was highly outweighed by the prejudice that the fact that not only was this expert talking about conspiracy organizations, but he was also discussing – but this expert was also the case agent on the case, which was very prejudicial, even more so than what the testimony actually was. And how did that come out? Well, that – That came out from the defense, correct? Well, it had to come out from the defense, and the government knew that that had to come out for the defense. One of the things that I want to point out to the Court is that here we have the case agent who the government presents as the expert in this case. They bring him from Washington, D.C., to testify as to this case, and he happens to be the person who authored the reports, the person who was the liaisons with the victims. He happens to have been the person that prepared the case for a grand jury testimony. So – but it's incredible to me that they couldn't find another expert who was not the case agent when we have thousands of agents with the same amount of expertise, if not more. It just seems to me that it helps you, not – it doesn't hurt you. I mean, if anything, it just calls into question the – whether the agent is biased in giving his expert testimony. And that's why the defense had to bring that up, because it is a jury issue about the biasness. Why can't it go to weight and not to admissibility, then? Because then it goes back to the prejudice issue, that it's so highly prejudicial to have this agent that the Court backs with its qualifications of expertise to have this case agent qualified as an expert, and not – and lets this agent testify without any boundaries. But doesn't – isn't – this is somewhat unusual, is the case agent, I thought, was pretty candid about, you know, how he wanted things to come out or the expert. I mean, he was more than most people who say, well, whatever the jury decides. He pretty much said, yes, I got a point of view in this whole thing. So to the extent there could be some prejudice, wasn't it mitigated, then, by his actual testimony, like, yes, I might have a bias here, and then the jury can determine when, in light of that, what weight should we give his testimony? Well, yes, but there also – you take a look at all of the Freeman and Dicogeny issues, and those weren't taken care of in this case. There was no cautionary jury instruction. But am I right in thinking that those cases were different because the case agent both testified as a precipitant fact witness and an expert witness in the same case, whereas here that didn't occur? And I would disagree that it didn't occur here, because the government, when they presented this case agent, knew that this person, that the fact that he was a case agent and what he did in the case was going to come out, because they had to bring it out for the purposes of biasness. So even at the hearing, at the hearing when they qualified him, the judge told – Judge Zapata told them, well, that's going to be something you're going to have to bring out at – during your cross for the purpose of biasness. And so everyone knew that the fact that he was a case agent and what he did in that case was going to come out – testimony from him was going to come out during the phase of the cross-examination, and no one took any steps to limit what he was going to say or to demark how that testimony was going to be presented. Do you want to save the remaining time for your co-counsel? Yes, thank you. May it please the Court. My name is Francisco Leon, and my client in this matter is Mr. Carlos Calipso-Bustamante. And I will be addressing the sentencing issues. With regard to Mr. Guisar Bonillas, in the brief there's an argument that the sentencing court erred in applying a two-level enhancement based on an aggravating rule, that he – that Mr. Guisar was an organizer, leader, or manager or supervisor of criminal activities. And it appears that the Court concluded that because he was in charge of the stash house or the drop house, that that was – that made him an organizer-manager. But – I think the Court said something to the effect he's the manager of the house. Correct. So to speak. So who else was in that house at that time besides this – who the jury determined the house was? The only evidence of who was in the house was the co-defendant, Mr. Calipso, and the undocumented aliens. There was no other co-participants to the offense that were there. At least there's no evidence of that in that regard. And so the judge seems to have made the conclusion, well, I don't think that he's actually supervising or managing Mr. Calipso, but because he's the manager of the house, I can apply this enhancement. But you have to actually manage people, correct? Or do you not? I mean, you can manage the organization, I suppose, but what do you think that the guideline requires? I think the guideline requires that there be co-participants in the offense. And the only other person that was even identified was Mr. Calipso. And I think there was maybe one reference to one other person. But the court found that Mr. Gazzar managed some sort of people in the house. I think those were the court's words. So he found that there were people that the defendant was managing, not just one person and not just the house, although he also found that the court was a stash house – that the defendant was a stash house sitter. But that's not what the – the guideline doesn't require that someone manage people. It requires that the person manage co-participants in the offense. And that's what the district court didn't find, and that's why the application of that enhancement was inappropriate. Let me just ask you about the co-defendant, because I did read the district court as finding that your client managed a co-defendant, and there was some evidence in the record to support that finding, no? Well, I don't know specifically what you're referring to. PSR. PSR said that the victim testified that your client was – or the co-defendant was your client's second-in-command, and that your client was the one who spoke to the boss, and whereas the other guy didn't. I would think that that would be enough for the district court to infer that your client was managing the co-defendant. If that's exactly what the court found, but if you read the sentencing transcript when Mr. Calixto is being sentenced, what the judge says is not that he's managing Mr. Calixto, but that he's managing the house and other people, and he doesn't identify them as co-participants. In fact, in Mr. Calixto's sentencing, the judge specifically says, I don't think that they were managing each other. They seem to be at about the same level, not one managing the other, and specifically rejects the finding that Mr. Guisar is managing Mr. Calixto or the other way around. And as I say, the guidelines seem to require management of, if you will, subordinates within the organ of the ---- within the offense who are co-participants. Well, counsel, if the court found that he, Bonilla, supervised whatever went on in that house, and it was a stash house, then doesn't it, by inference, suggest that Bonilla was managing not only some of the people in the house, but some of the illegal activities in the house? It does suggest that, but that's not what the guideline requires. The guideline requires management of co-participants in the offense. So the fact that you might have people that you're in charge of has to be ---- The guideline reads that you have to be the manager, leader, whatever, of, quote, one or more other participants. Correct. So it has to be over a person. Correct? Participants in the offense. In the offense. Right. Not, as in this instance, for example, the undocumented aliens. Correct. I would like to move on to the rest of the ---- my argument, because I think that's really important. The sentencing court in this instance applied an enhancement, a specific offense characteristic, finding that a dangerous weapon was used. And the only weapon that we're talking about here is a firearm. And in making that determination, the sentencing court, first of all, referred to the fact that there's no firearm that was discharged. So it had to have been whether or not a dangerous weapon was otherwise used. But the court also, it seems to me, relied on the pre-sentence report, which said handguns or guns were present. And the court looks then at application note C or, excuse me, application note 1C to the guideline and says, well, mere brandishing is enough. Well, we know that's a mistake. That is a mistake. And in fact, the government concedes that. Yes, the government concedes that. So we kind of start with the court did make or at least stated a standard that's not accurate. But what about Trujillo's testimony that Bonilla-Guizar pointed a gun or, I think, he said, I don't know if it was a weapon or a gun. He said a gun at him. Why, even though the district court may have erred in its standard, why wouldn't that be harmless if this is, in fact, the record before us? Because if you read the sentencing judge's description of what he was doing at pages I think it's 19 and 20 of the August 23rd sentencing of Mr. Guizar Bonilla, he says, look, these weapons were destroyed by the prosecution, and the defendant is not able to cross-examine Mr. Lopez Bonilla about whether or not those weapons were used in the way that he claims they were used. So it appears that the judge was somewhat reluctant to make a finding that, in fact, the weapons were pointed. Why, counsel, why does the destruction of the guns have anything to do with that issue? I know that's what the judge said, but I haven't been able to figure out why that would be, why he would think that. Because the defendants were unable to cross-examine the witness, Mr. Lopez, about what he was testifying, that the gun was aimed at him in a certain fashion that he was able to recognize. The guns were already destroyed. It was impossible at that point. And, in fact, the judge precluded the prosecution from introducing any evidence about the guns. So all you have is Mr. Lopez, whose cross-examination is severely limited by the fact that these weapons have been destroyed, and he can't be cross-examined about it. Why? I don't understand. The victim says somebody pointed a gun at my head. Why do I need to have the physical object there to prove that? Well, if you're going to rely on the fact that it's a firearm, I think you run into the problem of Burnett. Just because something appears to be a firearm or a gun doesn't make it so. In Burnett, there was a starter pistol that the district court treated as a firearm. In this instance, there was no way to prove whether or not that was a firearm. In fact, it was a gun. What was the precise testimony that Lopez Trujillo gave about the gun being pointed at him? He said he saw both of the defendants with a firearm from time to time. I believe on occasion he said that it appeared to him they were pointing it at him. And the reason he was able to make that or draw that conclusion is because apparently the gun had a laser aimer or something. Right. And that's what he saw. And one of the agents who discovered the gun said that, in fact, this particular weapon that they found did have one of those devices, right? Well, we don't know whether it's a gun or not because there's no evidence about that. And as far as the laser aimer. You say no evidence. We have testimony. That's evidence. Well, we have testimony that there was something that appeared to be a gun. But as I say, the Burnett case. But Lopez described the gun, didn't he? He described it with some degree of specificity, in addition to what color it was, how it loaded, et cetera. But as I say, the Burnett case seems to suggest that just because something looks like a gun doesn't make it so. In fact, the definition of what a firearm is within the guidelines and is applied in Burnett means that it's got to be capable of discharging a projectile by explosive force. That couldn't be done in this instance. It may have been, for all we know, it may have been a water gun. It may have been a toy gun. It may have been something that looked like a gun. But under 1B1.1, an object that resembles a firearm is still treated as a firearm, isn't it? I don't believe so. Or it's still treated as a dangerous weapon. It may be treated as a dangerous weapon. But here again, you go back to the definition of what otherwise used means, and it's got to be more than merely brandishing it. And you can't do that. Well, don't you think pointing a gun at something or pointing something at someone that's in the nature of a weapon is more than brandishing? Wouldn't you agree with that? If that were what the court found, I would agree with that. But that's not what the judge found. But that's what the testimony is, is that? Yes, but the judge said, I'm not going to consider that, essentially, because of the fact that the defendants were not able to cross-examine Mr. Lopez about the gun. What I'm finding is that the judge did make a mistake on the brandishing being the baseline. In your view, should this go back to the judge with the appropriate instructions and context in which to make the sentencing decision? I think it does have to go back. And I think the judge has to be instructed, or part of the opinion has to indicate, that the judge has to make a finding of whether or not the weapon was the dangerous weapon was otherwise used. If it's a gun, I believe he's not going to be able to make a finding that it is a gun, so he has to conclude that it's a dangerous weapon. But then he also has to make a finding of whether or not it was otherwise used as required under the sentencing guidelines. And there, I think, we're hindered by the fact that the defendants were not able to cross-examine Mr. Lopez because the weapons were destroyed. I think we have your points in mind. We've let you go quite a bit over, so we'll give a little extra time to the government if they need it as well. Thank you, Your Honor. May it please the Court, Erica McCallum appearing on behalf of the United States from the District of Arizona. What I'd like to do is address, in order, the issues that the defendants raised. So starting with the expert witness, and turning to the Mejia Luna case, the discussion this has been whether or not, first of all, whether or not that expert testimony was relevant to this case. And looking at the substance of that testimony, there are several points that were absolutely essential to the case. First of all, as this Court has referenced, this was a unique case because it was not simply a human smuggling case. It was a human smuggling case that transitioned into a hostage-taking. And that expert testimony was useful to the jury. It assisted the jury, which would not be expected to have a clear understanding of the distinction between those two types of offenses. And what so you heard your opponent here say that there was no such expert testimony offered on that point. And so what specifically did the case agent offer on the distinction between mere human smuggling and hostage-taking? That former case agent, who was testifying purely as an expert, at least on direct, described how a hostage-taking, it becomes a hostage-taking when, for example, a person's clothes are taken away, when their identification is taken away, when threats are made, when the price changes, which is what happened here, from $1,500 to $2,300, when there are bars on the windows. So when the person goes from, when the victim goes from someone who's made a deal to be transported into the United States for a certain amount, and the terms change, and then that person is not free to leave, this particular victim was. That seems like something the jury could figure out on its own, whether, in fact, somebody felt that they were free to leave. I don't understand why you need expert testimony to focus the jury on that point. I think the reason that the judge allowed that expert testimony, and I think it was correct, is that that's not something that a common everyday juror may understand. And it puts that, the victim's testimony into context. There are a couple of other areas as well, where it was. Before you leave that point, though, because it seemed to me that was really the only thing that the expert here could help the jury with. And they had testimony from the victim who said that these people told me unless my wife came up with the money, they would kill me, and I wasn't able to leave. Again, it just seems to me that's well within the common experience of jurors to figure out whether that person was, in fact, taken as a hostage, no? Perhaps if we looked in at sort of the body of the testimony from the expert, it may, that may be one point, but there are others as well. One is that this victim was delivered to a drop house. It's not in the common everyday understanding of a juror to understand the function of a drop house. And the expert was comparing the drug trafficking organizations, which may be more familiar to juries, as opposed to the structure of a human smuggling organization. One's a pyramid, compartmentalized. The other has little groups that interface with each other but are, in a sense, equal to each other. And the purpose of the drop house is to get that commodity, that human being, into the United States and then collect the money. So that is distinct from a drug organization where the marijuana or whatever drug it may be is something that's simply moved from place to place in the United States and paid for at the end. But with humans, once you get them to the drop house, they're essentially, they're held there until they're paid for. And then they're moved further into the interior of the United States. So again, that was useful to the jury to understand when you get to the drop house, you're particularly vulnerable. Counsel, is there a reason that the government chose to use a case agent as an expert? Certainly, given the expertise the government has in these matters, it could have brought in an independent expert where there wouldn't be this apparent bias. And then you put the defendant in a real precarious situation because you didn't bring it up on direct, but it has to be brought up on cross. And then you can argue, well, we didn't bring it up. The other side brought it up. So can you comment on that? This particular expert had a great deal of experience, over 15 years' experience, as a case agent on the ground investigating these types of organizations. He was the only of his kind in the government? I don't know whether there are others or not. You don't think so, do you? Sure there are. I guess you don't call him up every time you need somebody in the District of Arizona now, do you? To be candid, I don't know who we're using as an expert. But this individual clearly was qualified by the district court. And the government was scrupulously careful in following the Mejia Luna case in only offering expert testimony. They only asked this expert to put on one hat, an expert hat. Now, the weakness from the perspective of the government is, well, on cross-examination he's going to get hit for potential bias. But as this court has pointed out this morning, he was candid about the fact that he's a government agent and he does have some bias toward the government. But he also said, I want, I believe justice should be served. And he was asked on cross-examination, do you have a personal stake in the outcome of this case, considering that you were a case agent for a period of time? And he said no. He's handled many cases. And he's now moved to Washington and is handling a more expert-focused type of job. And so what happens in this case was the personal outcome did not matter to him. And in a sense, this was positive for the defense to be able to bring that out. Now, with regard to the hats, this witness never did provide any testimony either on direct or on cross that was fact testimony. On cross-examination, he provided testimony describing portions of the investigation, the fact of the investigation. Yes, I authored the search warrant. Yes, I was there the day the search occurred. Yes, I interviewed witnesses. Yes, I wrote reports. But he gave no testimony about his personal observations, about what was in the content of his reports. He did not identify the ledgers or talk about the contents of those ledgers, although he did give testimony that gave context to what the significance of those ledgers were. And he also didn't, there was one of the defendants that he arrested and he did not identify that defendant in court. So whether on direct or on cross, he kept that expert hat on. And so there's no, really no risk of unfair prejudice as far as that witness goes. If the court has no further questions on that, I'd like to turn to the sentencing issues. As far as the question of whether Defendant Bonilla was a manager and merited that enhancement, if you look at pages 26 to about 38 of the excerpt of record, it puts into context the district court's comment saying, well, clearly, Mr. Bonilla was a manager of the people in the house. And the defense has argued that that meant that the court mistook participant for hostage. In other words, the only people in the house he could have managed that would count here is the co-defendant. Well, there was testimony from the victim that there were other individuals and from the other agents that there were other individuals arrested from that house. But what the victim described is there was a man there who he believed his name was Chapo, who was served as a guard. There was a woman who delivered food, cooked and delivered food to the victims who were being held there. There was a woman who came in and cleaned every day. So there were other people who were both living in the house and participating in the offense. The cleaning lady, a co-participant in the crime? She was not charged. These folks were not charged. So, I mean, the problem is that there's people coming and going. But what he basically is saying, it was basically a house sitter, a stash house sitter that takes control by use of a firearm. He says, well, to some degree, he was a manager of some sort of the people in the house. But it seems to me that when you read this in the context of the evidence, he's actually conflating co-participants in the crime with the aliens who are in the house. And I'm having trouble unscrambling his words to get to your conclusion. Maybe you can help me out. And I'd like to try to clarify that. If you look at page 28 of the excerpt of the record, the defense counsel was arguing against this enhancement for Defendant Bonilla, and he stated that the people living in the trailer were on the, quote, unquote, ground level of the organization. And there has to be some sort of intrinsic evidence that elevates Bonilla, Defendant Bonilla, beyond the other folks that were living in the situation. So what was the evidence? The evidence was, well, then the government came in and argued, well, these other folks were involved in the operation but were not charged. And the district court's response to that was that Bonilla was, and it's undisputed, defense counsel agrees, it's undisputed, that the district court said Bonilla was the manager of some sort of the people in the house. So it's the government's position that meant he was responding to that argument. And what everyone was talking about, perhaps not as clearly as they could have been, was the people in the house were the people that were helping out to run this operation. So the co-defendant and the guard, those are the two that I've heard you mention. The co-defendant and the guard. The cleaning lady. The woman who cooked and fed. She's not a participant. She's not a participant. Forget that. The co-defendant. Focus on the co-defendant, because your opponent, again, said at the co-defendant sentencing, the judge flat out said, no, these two people were basically equal in culpability. They're both writing in the book. They're both talking. They're both. I'm not sure that's exactly what the district court said. It's my understanding that the district court saw Bonilla as being someone who was in charge of the co-defendant. We can also look at the broader category of people involved here. We have evidence that Bonilla was on the radio with this guide, Flaco, who is driving the people to this restaurant on Valencia Road. But the judge said people in the house. Flaco is not in the house, so I think you ought to put him aside. And then the judge also says about the people in the house that the way he takes control is apparently by use of a firearm. Well, that doesn't really speak to the co-participants. That speaks to maintaining control over the undocumented individuals. And that conversation was not entirely unambiguous. I agree. I do think, however, that this Court can affirm for any reason supported by the record, and I do think that there is evidence, sufficient evidence, that Bonilla was the individual who called the boss. He told the victim, I'm going to call or I have to call the boss. I'm going to come back and talk to you. He called the boss and came back and said, the price has changed. It doesn't matter how I collect this money. You're paying me $2,300 before you get out of here. He brought the guy, he led the guides from this restaurant to the trailer. He brought everybody inside the trailer. He had the guides spend the night there in the trailer before they left. And so you can see that Bonilla was not only directing other people involved in the organization, the other participants, but he was also managing the operations at that house. And I seem to know that. Kagan. But the managing the operations at the house doesn't get you inside the guideline, does it? It has to be people. The guideline has two parts. The guideline says you can be a manager of more than one or more participants, or you can exercise management responsibility over the property assets or activities of the organization. So if he's running the activities, even if we can't point to a particular person, that enhancement still applies. What about the last point where the judge obviously did make a mistake about the brandishing? Your colleague says, really, this needs to go back. What is your position on that? I don't believe it's necessary to send it back for several reasons. Primarily, this is a harmless error type of situation where I'm looking for the name of the case here. Also, we're looking at this under plain error review, correct? That's correct. But in a situation like this, even if that enhancement were not applied, the guideline range would still encompass the sentence that was given. And so that's one of the primary reasons that that particular enhancement isn't raised. Well, I don't think we can affirm on that ground. The judge always has to correctly calculate the guidelines before figuring out what the sentence is. I don't do you have a case that says we just affirm as long as it's anywhere within the range that ultimately? I do. That's the Munoz-Camarena case. That case says that there's significant procedural error. And in that case, the judge imposed a 16-level enhancement where a 4-level enhancement should have been applied. And that case discusses where, and it refers to it as harmless error, there are circumstances where if the sentence, the quote, unquote, correct guideline sentence overlaps with the sentence that was given, remand is not necessary, resentencing is not necessary. What's the site? I got the name. What's the site? I got the name of the case. What's the site? The Munoz-Camarena case. I don't have the site, but it is in the answering brief. Okay. Okay. Also, looking at the, just very briefly, I did file a 28J letter on the issue of the dangerous weapon. This Court has said if you aim firearm at an individual and also if you make threats in addition to that, you are otherwise using a firearm or a dangerous weapon. So under that case, and that's the Alberton case, this is where the enhancement the evidence is sufficient here because the witness testified, first of all. No, I, you're certainly right about that, but it's just the statement by the judge was so definitive that if something more than mere brandishing needed to be shown here, I wouldn't. He said I don't think I can get there or I don't think you, the government, can get there. I just, I found that to be the biggest sticking point for your argument here. I'm sorry. I didn't quite understand. The judge said in getting the standard wrong that if something more than just the brandishing were required, that he would not, did not think he could impose the enhancement on these facts. And I just, I'm not sure how we can get past that, even on plain error review. All right. I think we have your arguments in mind. Could you put a minute on the clock for the rebuttal? Even though we've kind of given you about five extra minutes, they think it's fair after the government. If you'll focus on the sentencing, I think, was the issue she focused on. That Munoz-Camarena case, we do cite in our reply brief, and in fact, it does state that a mistake in calculating the recommended guidelines sentencing range is a significant procedural error, does require a remand for resentencing. So in this case, it appears that the government seems to want to have it both ways. On the one hand, they concede error. But on the other hand, they say it's okay. The other point that I'd like to make with regard to the Albrecht case. You weren't the trial lawyer, correct? No. I didn't think so. Of course, this would have been we wouldn't be here if they hadn't raised this issue. But I didn't think you were the trial lawyer, so thank you. No. With regard to the Albrecht case, I think that case is a little bit of an anomaly here, because in that case, the appellant asked this Court to review a videotape. And on the basis of that, was arguing that he didn't do anything more than brandish. In this case, as I say, the judge very clearly states that he finds brandishing is enough. That's what he pretty much says. And the other thing is, he doesn't go as far as going beyond that, because he says these defendants didn't get a chance to cross-examine because the weapons had already been destroyed. So I think you're right when you say he's making it very specific that brandishing is enough for him, but obviously, the guidelines require more than what was done in this case, and that's why it does require a remand. Thank you. Thank all counsel for your argument this morning. The case of the United States v. Bonilla-Guizar is submitted.
judges: Marbley, McKeown, Watford